UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

ROBERT RAY FERGUSON,

                Plaintiff,

v.

DR. DAVID AGLER and DR. MURRAY YOUNG,

                Defendants.

Case No. 1:15-cv-00073-EJL-CWD

**REPORT AND RECOMMENDATION**

## INTRODUCTION

Pending before the Court are Defendants' motions for summary judgment. (Dkt. 26, 28.) Having reviewed the parties' briefs, as well as the record in this matter, the Court concludes oral argument is unnecessary. Dist. Idaho L. Rule 7.1. Accordingly, the Court enters the following report recommending the motions for summary judgment be granted and the complaint against Defendants be dismissed with prejudice.

# FACTS[1]

Ferguson is a prisoner in the custody of the Idaho Department of Correction, currently incarcerated at the ISCI medical infirmary. (Dkt. 33.) In his complaint, Ferguson alleges that, in July of 2014, he was informed by Dr. Young that he needed a hip replacement. (Compl., Dkt. 3, at 2.) However, Dr. Agler allegedly told Ferguson that he wanted to put off the hip replacement surgery for another year "for the damage to progress to the point that . . . Plaintiff would become a cripple." (*Id*. at 3.) Dr. Young allegedly agreed with Dr. Agler's plan. As of March 5, 2015, the date Ferguson filed the complaint, Ferguson alleges he had not been referred to an orthopedic specialist regarding a potential hip replacement. Ferguson claims also that Drs. Young and Agler agreed to wait an additional year to see what further damage would surface. Ferguson alleges Dr. Young failed to treat his hips resulting in further significant injury and unnecessary pain.

In responding to Defendants' motions, Ferguson has not provided an affidavit of a medical expert, and has simply invited the Court to examine the medical records for evidence of "continuous deliberate indifference;" he argumentatively states Drs. Agler and Young are responsible for causing him harm by the delay caused from failing to schedule appointments. (Dkt. 31 at 4.) Ferguson asks the Court to grant his request for an appointment of a specialist bone doctor to rebut Defendants' medical experts.

---

[1] The facts contained in this section are undisputed unless otherwise indicated. When the facts are disputed, they are taken in the light most favorable to Ferguson, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).

Because Ferguson failed to file an appropriate opposition in the form of a citations to the record, or affidavits rebutting Defendants' assertions of fact, the Court considers the facts as set forth by Defendants undisputed for purposes of the motion. Fed. R. Civ. P. 56(c)(2). The facts most critical to an understanding of the issues follow.

### A.   *Defendants' Backgrounds*

David Agler, M.D., is licensed to practice medicine in the State of Idaho. (Aff. of Agler ¶ 3, Dkt. 26-4.) He has been licensed to practice medicine in the State of Idaho since 2007. (*Id.*) From September of 2010 until approximately April of 2015, and from June of 2015 until the end of November of 2015, Dr. Agler was a physician at the Idaho Correctional Institution ("ICC"), which is now named the Idaho State Correctional Center ("ISCC") and, for a limited period of time in April and May of 2015 and again in approximately December of 2015 to the present, at the Idaho State Correctional Institution ("ISCI"). (Agler Aff. ¶ 4.) Dr. Agler indicates in his affidavit he is familiar with treatment of hip issues, such as those presented by Ferguson. (Agler Aff. ¶¶ 19-21.)

Dr. Agler assessed and treated Ferguson on several occasions for a variety of medical needs beginning in May of 2013, and continuing through September of 2014. (Agler Aff. ¶ 7.)

Dr. Young received his medical degree in June of 2000 and completed a family medicine internship and residency in Colorado. He is board certified in family medicine and a member of the Society for Correctional Physicians. He has been licensed to practice medicine in Idaho since July of 2013. (Aff. of Young, ¶¶ 2 and 3, Dkt. 28-8.) Before working for Corizon, he worked as an emergency room physician in Laramie,

Wyoming, and then was Medical Director of Wyoming Corrections at the Wyoming State Penitentiary until June of 2013. (*Id*. ¶ 4.) Dr. Young had experience treating patients complaining of left and right hip pain and who had labral tears and Femoral-Acetabular Impingement Syndrome ("FAI"). (*Id*.)

From June of 2013 to present, Dr. Young has acted as the Regional Medical Director ("RMD") for Corizon for the State of Idaho prisons. His duties as RMD include overseeing the medical care at Idaho's prison facilities (such as ISCC), and Utilization Management that includes overseeing requests for an inmate to have medical appointments and consultations outside the prison (i.e. offsite). Additionally, Dr. Young provides direct care and treatment to some inmates as the need arises, including involvement in some of the more difficult medical cases. (Young Aff., ¶¶ 4, 5.)

On July 1, 2014, Corizon (who contracts with the Idaho Department of Corrections (IDOC) to provide medical services to inmates) began managing the medical care at ISCC, where Ferguson was then incarcerated. At that time, Dr. Young and Corizon took over the management of medical care at ISCC, and Dr. Young began his involvement in Ferguson's care. (*See* Young Aff., ¶ 6.)

### B.   *Treatment History*

Dr. Agler first assessed and treated Ferguson for hip pain on May 23, 2013. (Agler Aff. ¶ 8.) His assessment was left hip bursitis, and he injected Ferguson's left hip with Kenalog and Lidocaine. (*Id*.; *see also* Dkt. 26-11 at 50.) Ferguson's pain was decreased after the injection and Dr. Agler advised Ferguson to follow-up as needed. (*Id*.)

Dr. Agler assessed Ferguson on December 21, 2013, in relation to left hip pain. (Agler Aff. ¶ 9.) He noted Ferguson demonstrated good compliance with the home exercise plan, and noted no change in symptoms despite stretching and strengthening exercises, and that Ferguson's range of motion appeared full. (*Id*.) Dr. Agler determined the symptoms were consistent with snapping hip syndrome and ordered a follow-up in two to four weeks. (*Id*.; *see also* Dkt. 26-11 at 29.)

Dr. Agler assessed Ferguson on January 17, 2014, at which time Ferguson's right hip was the focus of his complaints. (Agler Aff. ¶ 10; Dkt. 26-11 at 25.) Ferguson subjectively reported right hip pain worse than his left hip pain. (*Id*.) Dr. Agler reviewed an x-ray from 2012, which showed mild osteoarthritis, and observed that Ferguson's right hip had full range of motion and demonstrated moderate pain with internal and external rotation. (*Id*.) Dr. Agler ordered an MRI to rule out necrosis and noted that Ferguson might benefit from an x-ray guided steroid injection as the next step if osteoarthritis was discovered. (*Id*.) He also had previously ordered Mobic (a nonsteroidal anti-inflammatory (NSAID)) for Ferguson on January 15, 2014. (*Id*.) The MRI of the right hip was obtained on February 14, 2014. (*Id*.) The MRI showed a labral tear extending from the 10:00 to 3:00 position with a prominent cystic change at the anterosuperior femoral head neck junctions consistent with femoral acetabular impingement. (*Id*.; *see also* Dkt. 26-11 at 8 – 14.)

Dr. Agler reviewed the MRI of the right hip on February 20, 2014, and later reviewed the results with Ferguson on February 21, 2014. (Agler Aff. ¶ 11; *see also* Dkt. 26-11 at 6 and Dkt. 26-11 at 23.) In light of the labral tear and impingement, Dr. Agler

considered an ultrasound guided steroid injection prior to sending Ferguson to an

orthopedist. (*Id.*) The injection was scheduled for March 21, 2014; however, Dr. Agler

changed the hip injection to a fluoroscopically-guided right hip injection with 40 mg of

Kenalog and 1 cc of Lidocaine. (*Id.*) The procedure was performed by Brian Granvall,

PA-C at St. Luke's, with no complications. (*Id.*; *see also* Dkt. 26-10 at 42 - 51.)

Dr. Agler assessed Ferguson again on April 4, 2014, to evaluate his right hip and

Ferguson reported that the injection had helped with the pain, but then stated that his left

hip had always hurt more than his right. (Agler Aff. ¶ 12; *see also* Dkt. 26-10 at 30.) Dr.

Agler reviewed the chart and noted the chart documented otherwise. (*Id.*) Dr. Agler

observed Ferguson's general affect as comfortable and advised him to follow-up as

needed for right hip pain. (*Id.*)

Dr. Agler next assessed Ferguson on April 11, 2014, in relation to complaints of

left hip pain. (Agler Aff. ¶ 13; *see also* Dkt. 26-10 at 20.) Ferguson stated that the left hip

had always been more painful than the right and he complained of popping and groin

pain. (*Id.*) Dr. Agler observed Ferguson was in no acute distress and that the left hip had

full range of motion with no pain to internal or external rotation. (*Id.*) His strength was

5/5 and review of the left hip x-ray from February of 2013 showed only mild

osteoarthritis. (*Id.*) Dr. Agler's assessment was left hip osteoarthritis and, based on

Ferguson's good range of motion and functioning, he did not believe a MRI or an

injection was indicated. (*Id.*) Dr. Agler changed an order of Mobic to Indocin and

instructed Ferguson to follow-up as needed. (*Id.*)

**REPORT AND RECOMMENDATION  - 6**

Dr. Agler assessed Ferguson on June 19, 2014, for complaints of left hip pain. (Agler Aff. ¶ 14; *see also* Dkt 26-9 at 46 - 48.) He observed Ferguson as having a mild antalgic gait and left hip pain with internal and external rotation. (*Id*.) He ordered Percogesic (an analgesic medication) to be provided as needed and ordered an MRI and x-ray of the left hip. (*Id*.) The x-ray of the left hip was interpreted on June 27, 2014, and demonstrated mild arthrosis of the hip. (*Id*.; *see also* Dkt. 26-9 at 41.)

Dr. Agler next reviewed Ferguson's case with Dr. Young on July 3, 2014, after Dr. Young began as Medical Director at ISCC. (Agler Aff. ¶ 15; Young Aff., ¶ 8.) Therefore, Dr. Agler's order for a left hip MRI was postponed so that Ferguson could be seen and assessed by Dr. Young. (Agler Aff. ¶ 15.)

Dr. Young assessed Ferguson on July 16, 2014, in relation to his complaints of left hip pain. (Young Aff. ¶ 9; Dkt. 28-12 at 38, 28-13 at 4.) Dr. Young noted that the right hip was within normal limits and demonstrated good range of motion. (*Id*.) The left hip demonstrated pain on palpation and with manipulation and external rotation. (*Id*.) Dr. Young ordered another x-ray of the left hip and noted that, if it was positive for severe degenerative pain, he would make a referral to an orthopedic physician. (*Id*.) Dr. Young denies telling Ferguson he needed a total right hip replacement. (*Id*.)

The x-ray taken on July 18, 2014, revealed normal articulation with preservation of the joint space and only slight degenerative changes were seen with no bony destructive lesions. (Young Aff. ¶ 10; Dkt. 28-12 at 30-31.) The radiologist impression was "slight degenerative changes. Otherwise, negative left hip." (Dkt. 26-9 at 28.)

Dr. Agler reviewed the radiology report on July 23, 2014, and determined that the findings were benign and directed Ferguson to follow-up as needed. (Agler Aff. ¶ 15.) Dr. Agler denies having any conversation with Ferguson in July of 2014, during which Dr. Agler told Ferguson that he wanted the damage to Ferguson's hips to progress until he was a cripple. (Agler Aff. ¶ 16.)

Colin Brown, PA-C, assessed Ferguson on July 30, 2014, and noted that Ferguson was mildly aggressive and threatened a lawsuit. (Agler Aff. ¶ 17.) PA-C Brown ordered an MRI of the left hip. (*Id.*; *see also* Dkt. 26-9 at 24.)

On August 18, 2014, an MRI of the left hip was completed, which showed a small left labrum tear and some degenerative issues. (Dkt. 26-9 at 7 – 11.) On August 21, 2014, PA-C Brown reviewed the MRI results with Ferguson. (Agler Aff. ¶ 17.) In light of the labrum tear, PA-C Brown recorded in his medical notes he would discuss the possibility of surgery with Dr. Agler. (*Id.*)

PA-C Brown met with Ferguson again on September 2, 2014, in relation to chronic bilateral hip pain. (*Id.*) PA-C Brown noted that the case had been discussed with both Dr. Young and Dr. Agler. Dr. Agler does not specifically recall this discussion. (*Id.*)

PA-C Brown further noted that Ferguson refused to go to pill call and refused to be admitted to sheltered housing where medical care and treatment would be brought to him. (*Id.*; *see also* Dkt. 26-8 at 47, 48.)  PA-C Brown noted the refusal to be admitted to sheltered housing was Ferguson's decision. (*Id.*) PA-C Brown noted that pain management was sufficient and directed Ferguson to follow-up as needed for pain. (*Id.*)

Dr. Agler renewed an order for 1 to 2 tabs of Tylenol 325 mg by mouth three times per day. (*Id*.)

Dr. Young next assessed Ferguson on October 20, 2014, in relation to his complaints of bilateral hip pain and left side discrepancy of one inch. (Young Aff. ¶ 10; Dkt. 26-8 at 26.) His examination showed no obvious left side discrepancy, but he noted bilateral hip pain on palpation. (*Id*.) In light of the hip pain, Dr. Young ordered physical therapy for Ferguson. (*Id*.) Ferguson started physical therapy October 24, 2014, (Dkt. 28-11 at 27), that continued through May 19, 2015. (Dkt. 28-10 at 2.)

In October of 2014, the physical therapist noted that Ferguson had full range of motion and manual therapy and education was started. (Dkt. 28-11 at 27.) In November of 2014, Ferguson stated he was "doing all right." (Dkt. 28-11 at 21.) Ferguson was transferred to the South Idaho Correctional Center ("SICI") on November 13, 2014. (Agler Aff. ¶ 18.) After that date, Dr. Agler had no direct, personal involvement in Ferguson's care and treatment. Medical records indicate Ferguson's left hip complaints subsided toward the end of 2014.

In January of 2015, Ferguson's right hip started to become his primary complaint. On January 13, 2015, Dr. Dawson examined and treated Ferguson, who was complaining that his right hip was more painful than his left hip. (Dkt. 28-10 at 60.) She assessed that he had an abnormal gait, palpable pop in the left hip, no visible deformity, and that his range of motion was intact. (*Id*.) She consulted with Dr. Young and renewed a prescription for Indocin 50 mg by mouth three times per day as needed. (*Id*.)

**REPORT AND RECOMMENDATION  - 9**

Dr. Dawson, under the supervision of Dr. Young, began aggressive conservative treatment focusing on Ferguson's complaints of right-sided hip pain. The new treatments included new shoe inserts, new specialized shoes from the shoe specialist "Rosendahl," shoe lifts and aggressive physical therapy. (Dkt. 36-7 at 36 – 38; 26-8 at 14; 26-14 at 60.)

This conservative aggressive treatment showed tangible results. By February 3, 2015, Ferguson was riding a stationary bike for 20 minutes per day. (Dkt. 26-15 at 12.) By March 17, 2015, Ferguson was walking 1 mile per day. (Dkt. 28-10 at 40.) On March 17, 2015, Dr. Dawson noted Ferguson was thankful for his new shoes, that he was pleased with the inserts, and that he was walking 1 mile per day. (Dkt. 28-10 at 40.)

In April of 2015, at the direction of Dr. Dawson, Ferguson went to an offsite Orthopedics Clinic where the sports medicine specialist at St. Luke's Hospital, Dr. Homaechevarria, examined him. (Dkt. 26-7 at 21 – 31.) On April 24, 2015, Ferguson received a right femoroacetabular intraarticular steroid injection under fluoroscopic guidance, which was performed by Dr. Homaechevarria. (Dkt. 26-7 at 7-12.)

On June 2, 2015, Dr. Dawson discontinued the Indocin and ordered Ultram 50 mg by mouth three times per day as needed. (Dkt. 26-14.) When Ferguson reported little relief, Dr. Dawson requested a follow-up evaluation with Dr. Homaechevarria on June 2, 2015. (Dkt. 26-14 at 66.) On follow-up, there was noted to be inadequate improvement and a surgical consultation was requested on June 25, 2015 by the St. Luke's specialist. (Dkt. 26-14 at 65.)

Dianne Dice, PA-C, then requested a consultation on August 13, 2015, with Dr. Schwartsman, an offsite orthopedic surgeon. (Dkt. 26-17 at 51.) On September 3, 2015,

Ferguson had an appointment with Dr. Schwartsman, an orthopedic surgeon. (Dkt. 26-17 at 39-40.) Dr. Schwartsman requested a right hip MRI. (*Id*.) The MRI was scheduled for November 6, 2015, and the results were sent to the ISCC and to Dr. Schwartsman's office. (Dkt. 26-17 at 14-15.)

Ferguson was then taken to Dr. Schwartsman on December 3, 2015, at which time a right total hip arthroplasty was recommend. (Dkt. 26-17 at 9.) However, Dr. Schwartsman did not find that the right hip surgery was emergent and did not indicate that there needed to be a rush to schedule this non-emergent right hip surgery. In Dr. Young's absence, Dr. Agler in January of 2016, authorized and approved the right hip surgery. (Dkt. 26-19 at 47.)[2] The surgery was scheduled for April of 2016. (*See* Young Aff., ¶ 12.)[3] Dr. Schwartsman never recommended surgery for Ferguson's left hip. (Dkt. 26-17 at 9, 39-40; 26-19 at 40.)

In his professional medical opinion, Dr. Agler believes the medical care and treatment he provided to Ferguson in relation to both hips was both medically reasonable and appropriate. (Agler Aff. ¶ 22.) He believes it would have been medically unacceptable to recommend Ferguson undergo surgery at the times he assessed and treated Ferguson in 2013 and 2014. (*Id*.) The risks of harm to Ferguson far outweighed the potential benefits of any hip replacement. (*Id*.)

---

[2] Ferguson was transferred to South Idaho Correctional Center ("SICI") on November 13, 2014. (Agler Aff. ¶ 18.) Dr. Agler does not work at SICI, and once Ferguson was transferred to that facility, he had no further personal involvement in his care and treatment except for the approval of the right hip arthroplasty on January 26, 2016. (*Id*.) Dr. Agler authorized the request, because Dr. Young was out of the office at that time and Dr. Agler was authorized to handle consultation requests in his absence. (*Id*.)

[3] The Complaint was filed in January of 2016, while Dr. Agler's affidavit was filed in March of 2016. The Court does not know whether the surgery occurred or the results.

**REPORT AND RECOMMENDATION  - 11**

In light of Dr. Agler's recent review of Ferguson's medical chart, he does not believe that urgent hip replacement surgery was necessary for Ferguson any time during Dr. Agler's treatment of him, as he did not present with signs of a septic hip, avascular necrosis, or any other similar condition. (Agler Aff. ¶ 19.) In Dr. Agler's opinion, the risk of harm to Ferguson far outweighed the potential benefit of a hip replacement during 2013 and 2014. (*Id.* at ¶¶ 19-22.)

### C.   *Expert Medical Opinion*

Defendants submitted also the affidavit of Charles Schneider, M.D., who is a board certified orthopedic surgeon licensed in the State of Idaho since 1978. (Aff. of Charles Schneider, M.D., ¶ 1, Dkt. 26-5.) Dr. Schneider indicates in his affidavit he is familiar with treatment of hip issues, such as those presented by Ferguson. (Schneider Aff. ¶ 2.) Based upon Dr. Schneider's education, training and experience as a practicing orthopedic surgeon, it is his opinion that the care and treatment of Ferguson's left and right hips met the applicable medical standard of care in all respects in the community of Boise, Idaho, between 2014 and 2016. (Schneider Aff., Opinions ¶ 5, Dkt. 26-5 at 16.) He opines that Dr. Agler and Dr. Young treated Ferguson reasonably and appropriately when they personally provided care and treatment to Ferguson. (*Id.*)

# ANALYSIS

## 1.    Legal Standards

### A.    *Summary Judgment*

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). The requirement is that there be no genuine dispute as to any material fact. "Material facts are those that may affect the outcome of the case." *See id*. at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court

must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c) (3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue (dispute) as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

**REPORT AND RECOMMENDATION  - 14**

**B.**   *Section 1983 Claims*

Ferguson brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, Ferguson must establish the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). In other words, Ferguson must show that Defendants' actions caused the deprivation of a constitutional right. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp*., 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 ... is not satisfied by a showing of mere causation in fact[;][r]ather, the plaintiff must establish proximate or legal causation." *Id*. The United States Court of Appeals for the Ninth Circuit has explained: "A person subjects another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which he complains." *Id*. (internal citation omitted).

C.    *Eighth Amendment Claims of Inadequate Medical Care*

To state a claim under the Eighth Amendment, Ferguson must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard— deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> [F]ailure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain [;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official acts with "deliberate indifference ... only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted).

In context of medical care, a conclusion that a defendant acted with deliberate indifference requires the plaintiff to show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and ... harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o

**REPORT AND RECOMMENDATION  - 17**

prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Additionally, mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs*., 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Nor does the Eighth Amendment provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Finally, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

2.    **Discussion**

   A.    ***Eighth Amendment Claims***

The Court has conducted a careful review of the medical records, as well as the briefs and affidavits submitted by the parties, and finds Ferguson's claims to be without merit. Ferguson's arguments in his response briefs amount to a restatement of the allegations in his complaint, namely, that he continuously complained of bilateral hip pain, was told he would be given a hip replacement but not until he was disabled, and that

Defendants did nothing to ease his pain and suffering. (Pl. Brief at 4-5, Dkt. 30.) As to Dr. Young, Ferguson simply asserts Dr. Young failed to supervise the care providers who worked under his supervision, who in turn did not schedule appointments for him. (Pl. Brief at 4, Dkt. 31.)

Bare assertions and allegations unsupported by specific facts in the record do not suffice to defeat a motion for summary judgment. Moreover, the rule that all facts must be viewed in the light most favorable to the non-moving party does not require the Court to accept obvious fictions in resolving a motion for summary judgment. *See, Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts in ruling on a motion for summary judgment.").

Here, the medical evidence establishes that, far from allowing Ferguson to live with unresolved pain, he was seen by Drs. Agler Young, as well as other health care providers, on an ongoing basis. Several diagnostic tests (including multiple x-rays and MRI's) were ordered and reviewed. Ferguson was referred to physical therapy, which Ferguson reported was helping with his pain. He was given a variety of pain medications and several steroid injections to relieve the pain in his hips. When conservative care was exhausted, Ferguson was referred to an orthopedic specialist, a sports medicine specialist, and an orthopedic surgeon. As a result of the surgical consultation in August of 2015, Ferguson was scheduled for surgery. Ferguson was never without pain medication, care, or treatment of some kind at any point during the relevant time period.

**REPORT AND RECOMMENDATION  - 19**

The facts of this case fall squarely within the well-settled law that an inmate does not have a claim for deliberate indifference simply because he disagrees with his provider about the appropriate course of medical care and treatment. Ferguson's insistence upon receiving a hip replacement prior to exhausting the therapeutic benefits of conservative treatment and pain management is a disagreement between a prisoner and a medical provider, which is not actionable under the Eighth Amendment.

### B.    *State Law Claims of Medical Negligence*

The elements of a medical malpractice claim are set forth in § 6-1012 of the Idaho Code:

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care . . . such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided . . . .

Idaho Code § 6-1012.

The elements of a negligence action are the following: '(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)).

Idaho Code § 6-1012 requires that, in a medical malpractice case, a plaintiff must prove that the defendant physician negligently failed to meet the applicable standard of

**REPORT AND RECOMMENDATION  - 20**

health care practice of the community in which the health care was, or should have been, provided. The statute also provides that the defendant physician "shall be judged . . . in comparison with similarly trained and qualified [physicians] . . . in the same community, taking into account his or her training, experience and fields of medical specialization, if any." Idaho Code § 6-1012.

Idaho Code § 6-1013 provides that the applicable standard of practice and the failure of the defendant physician to meet this standard must be established by plaintiff providing "one (1) or more knowledgeable, competent expert witnesses." This expert testimony may be admitted in evidence only if a foundation is first laid establishing (a) that the "opinion is actually held by the expert witness," (b) that the "opinion can be testified to with reasonable medical certainty", and (c) that the "expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable community standard to which the testimony of the witness is addressed." Idaho Code § 6-1013.

Ferguson has not provided the evidence required by Idaho Code § 6-1013, and "in forma pauperis" status does not provide for the funding of expert witnesses for indigents. Further, Defendants filed the affidavit of Dr. Schneider who opined, consistent with Idaho Code § 6-1013, that Defendants met the community standard of care. Without a countervailing opinion, Ferguson's state law claims of medical malpractice or negligence by Drs. Agler and Young are subject to summary judgment.

**REPORT AND RECOMMENDATION - 21**

## CONCLUSION

Ferguson has failed to satisfy his burden upon summary judgment of showing that the materials in the record establish the presence of a genuine factual dispute. The Court will therefore recommend that Defendants' motions be granted.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)   Defendant Agler's Motion for Summary Judgment (Dkt. 26) be **GRANTED**; and

2)   Defendant Young's Motion for Summary Judgment (Dkt. 28) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **June 15, 2016**

Honorable Candy W. Dale
United States Magistrate Judge

**REPORT AND RECOMMENDATION  - 22**